UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,
*ex rel.* JOHN PEPE M.D., and RICHARD
SHERMAN M.D.,

                          Plaintiffs,

         v.

FRESENIUS MEDICAL CARE HOLDINGS,
FRESENIUS VASCULAR CARE., INC.,
and GREGG MILLER, M.D.,

                          Defendants.

**MEMORANDUM AND ORDER**

14-CV-03505 (LDH) (ST)

L<small>A</small>SHANN D<small>E</small>ARCY HALL, United States District Judge:

John Pepe, M.D., and Richard Sherman, M.D., ("Relators") brought this *qui tam* action against Defendants Fresenius Medical Care Holdings, Fresenius Vascular Care, Inc., and Gregg Miller, M.D. ("Defendants"), on behalf of the United States of America and the States of New York, New Jersey, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Michigan, Nevada, North Carolina, Rhode Island, Tennessee, Texas, and the Commonwealths of Massachusetts and Virginia (the "States"), alleging claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, analogous state laws ("State FCA laws"), and the California Insurance Fraud Protection Act ("CIFPA"). The United States partially intervened as to the federal FCA counts, pursuant to 31 U.S.C. § 3730. The States of New York, New Jersey, and Georgia filed a consolidated complaint-in-intervention, and the California Department of Insurance intervened on behalf of the State of California as to CIFPA claims. The remaining 15 states declined to intervene.[1] Defendants Fresenius Vascular Care and Gregg

---

[1] The Court dismissed Count XX under the Maryland FCA, which requires dismissal if the state does not intervene. (*See* ECF No. 44.)

1

Miller, M.D. move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Relators' nationwide FCA claims and non-intervened state FCA claims.

## BACKGROUND[2]

### I.    Factual Background

Relator John Pepe, M.D., is a board-certified internist and kidney specialist, who works as an attending physician at Richmond University Medical Center and Staten Island University Hospital in New York.  (Relators' Fourth Amended Complaint ("Compl.") ¶ 15, ECF No. 29.) Relator Richard Sherman, M.D., is a kidney specialist who serves as professor emeritus of medicine at Rutgers University and Medical Director of Dialysis at the Robert Wood Johnson University Hospital in New Jersey.  (*Id.* ¶ 16.)

Defendant Fresenius Vascular Care, Inc. ("FVC") is one of the largest clinic networks for interventional radiology in North America.  (*Id.* ¶ 26.)  In 2011, FVC's parent company, Fresenius Medical Care North America ("FMCNA"), acquired American Access Care Holdings ("AAC"), a clinic network that included 28 freestanding outpatient centers providing vascular access treatment to dialysis patients in New York and elsewhere in the United States.  (*Id.* ¶¶ 26, 28.)  Following the acquisition, AAC clinics were operationally integrated into the FVC chain. (*Id.* ¶ 29.)  According to its website, FVC operates 66 vascular access clinics in approximately 25 states and Puerto Rico, including 12 in New York State and four in New Jersey.  (*Id.*) Approximately 76% of FMNCA's patient base is covered through Medicare and Medicaid.  (*Id.* ¶ 108.)  Defendant Gregg Miller, M.D., has been FVC's Vice President of Operations since 2015. (*Id.* ¶ 31.)  Previously, Defendant Miller was FVC's Chief Medical Officer, and prior to that, he

---

[2]The following facts are taken from the Relators' Fourth Amended Complaint and, unless otherwise indicated, are assumed to be true for the purposes of this memorandum and order.

2

operated AAC of Brooklyn. After FMNCA's 2011 acquisition of AAC, Defendant Miller was appointed Chief Medical Officer of FVC. (*Id.* ¶ 131.)

Defendants own and operate several health care facilities that perform, among other things, fistulagrams, angiograms, and angioplasties. (*Id.* ¶ 118.) Fistulagrams are x-rays of fistula, angiograms are x-rays of blood vessels, and angioplasties are the widening of blood vessels by inserting and inflating a small ballon. (*Id.*) When properly administered, these procedures can improve the efficacy of dialysis treatments. (*Id.*) Medical staff monitor patients on dialysis to ensure that the treatment functions effectively. (*Id.* ¶ 119.) Specifically, medical staff monitor blood flow, blood vessel pressure, and waste removal measures, among other metrics. (*Id.*) If medical staff determine that a patient's vascular access is so compromised that it interferes with dialysis, the staff may refer that patient to one of Defendants' clinics for a one-time procedure to restore sufficient vascular access. (*Id.* ¶ 123.)

In Spring 2011, Defendant Miller approached Relator Pepe in an unsuccessful attempt to purchase his dialysis practice. (*Id.* ¶ 129.) During their discussions, Defendant Miller told Relator Pepe that if a dialysis center were owned by AAC or its new parent, FMNCA, the company could self-refer patients from its dialysis center to its vascular access clinics. (*Id.* ¶ 130.) Defendant Miller has made several public presentations to physicians on behalf of Fresenius endorsing the use of surveillance fistulagrams. (*Id.* ¶ 131.) For example, during one presentation, Defendant Miller represented that patients should return for scheduled follow-up elective fistulagrams after access intervention. (*Id.*) Defendant Miller also incorrectly stated that Medicare does not reimburse the dialysis center for fistula monitoring. (*Id.*) During another presentation, Defendant Miller stated that follow-up fistulagrams should be performed at intervals that are "ideally . . . just before" clinical measures of dialysis function decline. (*Id.* ¶

3

133.) However, Defendant Miller also stated that it is not possible to predict when the dialysis treatments will become inefficient. (*Id.*)

Beginning in at least October 2011, through at least August 2020, Defendants regularly scheduled follow-up visits with patients after they performed a referred procedure. (*Id.* ¶¶ 126–127, 159.) These follow-up visits, which typically entailed a fistulagram and angioplasty, were entirely "self-referred," that is, scheduled without obtaining the required referral from the treating physician or requesting the patient's recent dialysis records. (*Id.* ¶¶ 126–27, 146.) Relators plead specific allegations as to six individual Medicare patients—five who were treated in New York and one in New Jersey—each of whose experiences with Defendants included a combination of the following features. (*See generally id.* ¶¶ 163–243.) First, to facilitate the self-referral, Defendants generated false patient records that provided either no reason for the follow-up visits or an insufficient reason, such as to monitor unspecified future problems. (*Id.* ¶ 146.) Defendants also falsified patient records to indicate that future visits were referred by the treating physician who made the initial referral. (*Id.* ¶ 147.) At the beginning of the visits, Defendants performed a cursory physical examination, during which they would observe a purported vibratory sensation to justify immediately performing an unnecessary procedure without conferring with the treating physician or referring to clinical data from recent dialysis sessions. (*Id.* ¶ 151.) Defendants sometimes provided patients with free transportation, usually in a limousine, and free meals upon arrival. (*Id.* ¶ 134.) Defendants also told patients that their dialysis treatment would not be successful if they did not return for the follow-up visits. (*Id.* ¶ 141.) In some cases, Defendants self-referred patients as many as ten times over two years for unnecessary procedures. (*Id.* ¶ 155.)

According to the Complaint, and on information and belief, that Defendants use uniform operational and billing procedures across their nationwide network of vascular access centers. (*Id.* ¶ 162.)  The average reimbursement for the types of vascular intervention procedures that Defendant performed was approximately $2,500.  (*Id.* ¶ 273.)  Defendants electronically submitted claims to Medicare Part B on CMS Form 1450 for payment each time a patient received services at an FVC clinic.  (*Id.* ¶ 309.)

According to aggregated Medicare Part B payment data from 2012 through 2014, 28 of the 42 physicians listed on Defendants' website ranked in the top 30 total physicians for number of services performed in their respective states and specialties.  (*Id.* ¶ 290.)  Ten of those physicians were the largest single provider of Medicare services in their respective state and specialty.  (*Id.* ¶ 291.)  And 28 of the 38 FVC physicians for whom 2012 data was available ranked in the top 10% for services per patient in their respective state and specialty.  (*Id.* ¶ 292.)  In 2013, FVC physicians received over $82 million from Medicare Part B, and in 2014, $148 million.  (*Id.* ¶ 293–94.)

**II.     Procedural History**

Relators filed their initial *qui tam* complaint under seal in June 2014.  (Original Compl., ECF No. 1.)  The United States investigated the allegations over several years and Relators regularly amended their pleadings, culminating in their Fourth Amended Complaint, filed on August 7, 2020.  (Compl., ECF No. 29.)  The Fourth Amended Complaint asserts 29 counts under the FCA, several State FCA Laws, and the CIFPA, against Defendants FMCNA, FVC, Defendant Miller, and two German companies affiliated with FMCNA.  (*Id.* ¶¶ 1, 18–20, 35.)  On July 12, 2022, the United States filed a partial complaint-in-intervention, which brought federal FCA claims against Defendant FVC.  (U.S. Compl. in Intervention, ECF No. 48.)  The

United States filed an amended complaint-in-intervention on August 2, 2022, which added Defendants Miller and American Access Care Physician, PPLC, a professional corporation that Defendant Miller owns in part. (U.S. Am. Compl. in Intervention, ECF No. 63.) Relators proceed with federal FCA claims against Defendants FVC and Miller for alleged false claims submitted outside of New York. (*See* Notice of Partial Voluntary Dismissal, ECF No. 68.) Relators also proceed with remaining non-intervened state claims asserted against FVC and Defendant Miller, which include 15 counts under State FCA Laws: California, Colorado, Connecticut, Florida, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nevada, North Carolina, Rhode Island, Tennessee, Texas, and Virginia. (*See id.*) Before the Court is Defendants FVC and Miller's[3] motion, made pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Relators' claims for failure to state a claim.

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.*

---

[3] Relators voluntarily dismissed all claims against FMCNA and Count XXIX under the California Insurance Frauds Prevention Act. (ECF Nos. 128, 129.)

6

(citations omitted). Moreover, "Rule 12(b)(6) does not give the district court authority to consider matters outside the pleadings[.]" *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991). And it is "generally improper for the court to consider factual averments contained in affidavits on a Rule 12(b)(6) motion." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (quoting *Fonte v. Bd. Of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

Moreover, because "the FCA is an anti-fraud statute . . . claims brought under the FCA fall within the express scope of [Fed. R. Civ. P.] 9(b)." *Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.*, 328 Fed. App'x. 744, 747 (2d Cir. 2009) (citing *Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995)) (internal quotations omitted). To satisfy Rule 9(b), a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). In other words, "Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-0704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (citation omitted). "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *United States v. Cath. Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *6 (E.D.N.Y. Mar. 31, 2017) (citing *United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013)) (internal quotations omitted); *see also Rombach v. Chang*,

7

355 F.3d 164, 171 (2d Cir. 2004) (discussing the purpose of the particularity requirement and emphasizing fair notice to the defendant).

## DISCUSSION

The FCA imposes liability for, among other things, "knowingly" presenting or causing to be presented to the government, a false or fraudulent claim "for payment or approval." 31 U.S.C. § 3729(a). Although Congress has repeatedly amended the FCA, "its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. U.S. ex rel Escobar*, 579 U.S. 176, 182 (2016). Pursuant to the private, or *qui tam*, provision of the FCA, a private person may bring a civil action on behalf of the government, as a "relator," for violations of the Act. 31 U.S.C. § 3730(b), (c). To prove a false claim under FCA sections 3729(a)(1)(A) and 3729(a)(1)(B), a relator must show that the defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001). A "claim" includes direct requests to the government for payment as well as claims for reimbursement under federal benefits programs. *Id.*

### I. Relators' Nationwide FCA Claims

Defendants argue that Relators' nationwide FCA claims must be dismissed because Relators fail to plead those claims with the particularity that Rule 9(b) requires. (Defs.' Mot. to Dismiss ("Defs.' Mem.") at 10–18, ECF No. 131-1.) The Court agrees. Rule 9(b) requires plaintiffs to set forth "the who, what, when, where and how of the alleged fraud." *Polansky*, 2009 WL 1456582 at *4 (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). Despite the generally rigid requirement of Rule 9(b), allegations of fraud may be based on "information and belief when facts are peculiarly within the opposing

8

party's knowledge" and the plaintiff "adduce[s] specific facts supporting a strong inference of fraud." *U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81–82 (2d Cir. 2017). That said, this exception should not be mistaken for "license to base claims of fraud on speculation and conclusory allegations." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (noting that failure to plead a strong inference of fraud "will not satisfy even a relaxed pleading standard"). Indeed, "the circumstances constituting fraud [must] be pleaded with particularity." *Chorches*, 865 F.3d at 86 (considering allegations based on information and belief where relator was able to provide specific details of how and when fraud occurred and how it was linked to billing).

Moreover, while courts in this circuit have not squarely addressed the pleading standard governing claims of widespread fraud, courts that have analyzed such claims have required only representative examples to be pleaded with a high level of particularity. *See e.g., U.S. ex rel. Buth v. Walmart Inc.*, No. 18-CV-840, 2019 WL 3802651, at *7 (E.D. Wis. Aug. 13, 2019); *U.S. ex rel. Morgan v. Champion Fitness, Inc.*, No. 13-CV-1593, 2018 WL 5114124, at *3 (C.D. Ill. Oct. 19, 2018) (collecting cases). However, the plaintiff must allege facts sufficient to "support a reasonable inference that the fraud was, in fact, widespread." *Buth,* 2019 WL 3802651, at *7; *see also U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, No. 11-CV-962, 2013 WL 2303768, at *7 (N.D. Ga. May 17, 2013) (citing *Thompson*, 125 F.3d at 903) ("The ability to plead examples, however, is not a license to base claims of fraud on speculation and conclusory allegations.") (internal quotation marks omitted); *U.S. ex rel. Woods v. SouthernCare*, Inc., No. 09–cv–00313, 2013 WL 1339375, at *5–*6 (S.D. Miss. Mar. 30, 2013) (holding that non-specific allegations of company-wide fraud, beyond the defendants' conduct at four Mississippi offices about which relator had actual knowledge, did not satisfy Rule 9(b)).

9

Relators fail to plead facts supporting a strong inference of fraud. That is, absent from the 105-page complaint are any facts connecting the alleged conduct to "specific claims [that] were indeed submitted" to the government. *See Chorches*, 865 F.3d at 93. Relators' allegations of industry presentations by Defendant Miller, FVC's VP of Operations, regarding surveillance fistulagrams and preventative angioplasties offer no connection to billing for unnecessary procedures. (*See* Compl. ¶¶ 131–33.) Even if, as Relators allege, Defendant Miller incorrectly stated during a presentation that Medicare did not cover some of the interventions that he endorsed, (*Id.*), such a misstatement before a generalized audience cannot be said to evince an illicit billing scheme carried out by the company. Relators' allegations regarding Defendants' financial incentive policies, including offers of ownership or management interest to certain executives and physicians, (*Id.* ¶ 296), similarly fail to support a strong inference of fraud. Although Relators speculate that these offers incentivized unnecessary procedures, as Defendants aptly argue, such conjecture does not amount to allegations of specific circumstances and events that would turn Defendants' "seemingly legitimate activities into a fraudulent scheme." *U.S. ex rel. NPT Assocs. v. Lab. Corp.*, 2022 WL 3718265, *4 (S.D.N.Y. Aug. 29, 2022) (citation omitted); *see also U.S. ex rel George v. Fresenius Med. Care Holdings, Inc.*, No. 12-CV-877, 2014 WL 12607797, at *7 (N.D. Ala. Mar. 31, 2014) (existence of corporate-wide policies and billing practices and bonus structure that allegedly made fraud profitable was not enough to support inference of fraud without facts tying features to fraudulent scheme or allegations of corporate participation in fraud).

Nor does Relators' exhibit of Medicare data cure the deficiencies in their pleadings as to the existence of a scheme. (*See* Compl., Ex. 1, ECF No. 29-1.) Relators contend that Medicare Part B payment data for 2012–2014, which has been aggregated to reflect, by individual

physician, the number of Medicare services performed and total dollars received by Medicare, reflects that FVC's physicians performed a high number of vascular interventions and received "extraordinarily high" Medicare payments. (Rels.' Opp'n to Defs.' Mot. to Dismiss ("Rels.' Opp'n") at 14–15, ECF No. 131-3.) But a relator cannot state an FCA claim based on the "bare assertion that the results in and of themselves show" that violations "must" have occurred. *U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 696 (S.D.N.Y. 2018); *see also U.S. ex rel. Karp v. Ahaddian*, No. 16-CV-500, 2018 WL 6333670, *3 (C.D. Cal. Aug. 3, 2018) (allegations that defendants ranked highly for Medicare payments "show only that Defendants received significant payments from Medicare" during a period of time and are insufficient to state an FCA claim). And, as Defendants argue, Relators fail to adduce facts specifying that any of the payments reflected in this generalized data was the product of a false claim submitted to the government. (Defs.' Mem at 12–13); *see U.S. ex rel. Levine v. Vascular Access Centers L.P.*, No. 12-CV-5103, 2020 WL 5534670, at *5 (S.D.N.Y. Sept. 15, 2020) (holding that generalized data and allegations that quantity and frequency of visits indicated a lack of medical necessity were "insufficiently particularized to identify the false claims at issue"). In rebuttal, Relators attempt to distinguish the instant case from *Levine*, 2020 WL 5534670, at *5, and *Ahaddian*, 2018 WL 6333670, at *3, where courts found that generalized billing or reimbursement data could not, on their own, support claims as to a particular scheme. (*See* Rels.' Opp'n at 16.) Specifically, Relators argue that here, unlike in those cases, the aggregate Medicare data supplements specific allegations of fraud. (*Id.*) However, the aggregate data cannot serve as a "supplement" to allegations that the Court has already determined are deficient under Rule 9(b) and even the less stringent *Chorches* standard.

11

Relators allege on "information and belief" that Defendants' conduct occurred nationwide. (Compl. ¶ 162.)  However, they fail to adduce any facts supporting a reasonable inference that any alleged fraud was, in fact, widespread.  Relators point to six patient examples that supposedly demonstrate Defendants' "generic playbook" of facilitating unnecessary procedures that they then billed to the government. (Rels.' Opp'n at 13–14, 19; Compl. ¶ 160, 163–243).  As Defendants point out, five of these patients were treated at a single New York FVC center by doctors from one practice, and the remaining patient at a New Jersey center. (Defs.' Mem. at 12.)  Patient examples from such a limited geographic scope, without more, cannot reasonably support the Court's extrapolation as to nationwide practices.  *See U.S. ex rel. Acad. Health Ctr. v. Hyperion Found., Inc.*, 2014 WL 3385189, at *33 (S.D. Miss. July 9, 2014) (dismissing nationwide FCA claims where a relator alleged specific misconduct as to only one of a health care provider's facilities); *Fox Rx*, 2013 WL 2303768, at *7 (dismissing nationwide FCA claims where a relator only pleaded misconduct as to a single pharmacy and noting that the "[r]elator's contention, that [the] [d]efendants' 'nationwide' conduct should be inferred from the conduct for which [the] [r]elator alleges actual information, is exactly what is proscribed by Rule 9(b)").

As Defendants aptly argue, the collection of cases that Relators cite to support their argument that the six patient examples are representative of nationwide fraud are inapplicable here. (Defs.' Mem. at 11–12.)  Those cases, unlike the instant action, involved detailed allegations as to the manner in which alleged fraudulent practices were implemented on a national scale.  *See e.g., U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, 2012 WL 8667597, at *2 (D. Mass. Mar. 6, 2012) (alleging specific former employee knowledge of nationwide computer billing system used to submit false claims to Medicare); *U.S. ex rel.*

12

*Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363, at *15 (N.D. Okla. Mar. 7, 2019) (alleging that defendant programmed uniform billing software to bill false charges and describing communications that relator had with employees in other states regarding fraud); *U.S. ex rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 986 n. 8 (S.D. Ill. Sept. 18, 2013) (alleging billing practices mispresenting "usual and customary" prices were nationwide based on corporate control of billing and relator's experience as pharmacist in defendant's stores in different states).[4] No such allegations appear anywhere in Relators' complaint. Instead, Relators' bare assertions that these examples represent practices implemented "across [Defendants'] nationwide network of vascular access centers," (Compl. ¶ 162), are precisely the "speculation and conclusory allegations" that Rule 9(b) proscribes. *Fox Rx,* 2013 WL, 2303768, at *7.

Relators similarly fail to plead any facts supporting a reasonable inference that Fresenius's "1-Minute Fistula Examination" was a widespread practice. (Compl. ¶¶ 151, 153.) Relators assert that the existence of a video demonstration of the one-minute examination on Fresenius's website necessarily means that the examination was performed at centers throughout the country to justify unnecessary procedures that were ultimately billed to the government. (*Id.*) Yet, Relators cite to only three instances, in New York, in which Defendants performed the examination to justify an unnecessary fistulagram and angioplasty. (*See id.* ¶¶ 182, 212, 228.) In essence, Relators ask the Court to infer from the availability of a video demonstration on Defendants' website and three examples in which the examination was performed, that the examination was part of a "generic playbook" that was carried out across the country. (*See id.* ¶

---

[4] *See also U.S. ex rel. Brown v. Celgene Corp.*, 2014 WL 3605896, at *9-10 (C.D. Cal. July 10, 2014) (former sales representative provided details regarding the nationwide program to pay kickbacks to physicians and promote off-label use of high-cost drugs); *U.S. ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 543 (E.D. Pa. 2022) (finding that relator alleged specific misconduct in multiple jurisdictions where a representative of defendant alleged that schemes were presented as general trainings for sales staff in multiple regions); *United States v. BioTek Labs*, LLC, 2023 WL 374334, at *3 (M.D. Fla. Jan. 24, 2023) (alleging false claims were submitted in multiple states using two specific business models).

13

160.) The Court declines to do so, as Relators fail to plead that these practices were "in fact, widespread." *See Buth*, 2019 WL 3802651, at *7.

## II.  Relators' Non-Intervening State Law Claims

Relators' non-intervening state law claims fare no better. Defendants argue that Relators' non-intervening state law claims should be dismissed because they are not pleaded with the particularity that Rule 9(b) requires. (Defs.' Mem. at 18–22.) The Court agrees. Indeed, the Rule 9(b) pleading standard applies with equal force to state law claims. *United States v. Lab'y Corp. of Am. Holdings*, No. 07-CV-5696, 2015 WL 7292774, at *6 (S.D.N.Y. Nov. 17, 2015). Accordingly, courts have required that relators "allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings." *Id.*; *see, e.g., U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1277 (N.D. Ga. 2012) (finding relator's complaint "provide[d] neither the level of detail nor indicia of reliability required to support his state-law claims against the identified state defendants," where relator drew an inference of a nationwide scheme from his experience in two local clinics and his receipt of national office memoranda, "rather than his firsthand participation in billing and drug inventory management on a nationwide basis or in all of the identified states"); *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 723 (N.D. Tex. 2011) (holding that the facts a plaintiff alleged regarding events in one state "cannot support by inference her general pleading, 'upon information and belief,' that similar frauds were also perpetrated in" four other states). Here, Relators' Complaint is completely devoid of allegations of fraudulent conduct in any of the 15 non-intervening states. And, the Court has already determined that Relators cannot rely on conclusory allegations of nationwide fraud to support a claim that illicit conduct was carried out in particular states. Accordingly, Relators' non-intervening state law claims are dismissed.

**III.     Relators' Claims Against Defendant Miller**

Relators' nationwide and state law claims against Defendant Miller must also be dismissed. Defendants argue that Relators' claims against Defendant Miller should be dismissed because Relators fail to adduce any facts connecting Defendant Miller to conduct in any of the 15 non-intervened states. (Defs.' Mem. at 22–24.) The Court agrees. Where there are multiple co-defendants, the complaint must "inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Thus, even if the Court found that Relators adequately pleaded nationwide fraud, which they have not, Relators would still need to establish with particularity that Defendant Miller maintained a role in executing the alleged scheme. Relators assert that the complaint details how Defendant Miller functioned as the "architect and animating force" behind the alleged fraud. (Rels.' Opp'n at 14.) But the complaint only alleges that Defendant Miller was appointed to senior leadership at FVC, had one conversation with Relator Pepe in which Defendant Miller mentioned that FVC could self-refer patients from its parent company's dialysis center to its vascular access clinics, and presented at industry conferences regarding surveillance fistulagrams and preventative angioplasties. (Compl. ¶¶ 129–31). None of these allegations leads to a "strong inference" that Defendant Miller's role or conduct facilitated a national scheme in which "specific claims were indeed submitted" to the government. *See Chorches*, 865 F.3d at 93. Absent from the complaint are any facts connecting Defendant Miller's role or conduct to a nationwide scheme of billing the government for unnecessary procedures. *See U.S. ex rel. Graves v. Plaza Med. Ctrs. Corp.*, No. 10-CV-23382, 2014 WL 5040284, at *2 (S.D. Fla. Oct. 8, 2014) ("The fact that Mr. Angel is President of Plaza Medical Centers Corporation, or 'worked closely with [the doctor who improperly diagnosed patients]'

15

and may have 'profited from improper billing' is not, standing alone, sufficient to survive a motion to dismiss"); *see also Levine*, 2020 WL 5534670, at *2, 7–8 (dismissing FCA allegations against dialysis clinic owner where complaint alleged that owner collaborated with physicians working at clinic in performing unnecessary procedures but failed to "allege any particular instances" where owner did so). Accordingly, Relators' remaining claims against Defendant Miller must also be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Relators' non-intervened claims is GRANTED.

                          SO ORDERED.

Dated: Brooklyn, New York  
      October 31, 2024

/s/ LDH  
LaSHANN DeARCY HALL  
United States District Judge